And we'll hear argument next in United States v. Miller. Mr. Kline. Good morning, Your Honor. May it please the Court, my name is John Kline. I represent the appellant David Miller, and I'd like to reserve five minutes if I may. Just keep an eye on the clock. I will. Mr. Miller's conduct as proven at trial violated federal criminal law. Count 14 demonstrates that. That count charged a conspiracy to make false statements within the jurisdiction of the FDA. It also charged unlawful distribution of prescription drugs without an appropriate state license. Mr. Miller's conduct fit that charge. The evidence at trial supported it. He doesn't challenge that on appeal. So whatever this Court does in this case, Mr. Miller will remain convicted on count 14. The problem is the government didn't stop with charges that fit Mr. Miller's conduct. It added on mail and wire fraud charges, mail fraud charges and a wire and mail fraud conspiracy charge under a theory that this Court had rejected in Brookhousen and that this Court rejected again more recently in Millhiser. And then it piled on top of the mail fraud charges a RICO conspiracy charge and a money laundering conspiracy charge. That is exactly the kind of overcharging prosecutorial overreach that the Supreme Court of the United States and this Court have been resisting and pushing back against at least since McNally versus United States and particularly in the context of mail and wire fraud. You have McNally in 1987. You have the Cleveland case in 2000. You have the Skilling case. You have the Kelly case. You have the Simonelli case. And now before the Supreme Court is the Coussis case. Case after case after case from this Court, we have Brookhousen. We have more recently Yates. We have Millhiser. In case after case after case, the courts have told the government not to stretch the mail and wire fraud statutes beyond their proper bounds. And in case after case after case, the government has insisted on doing so. And this is one of those cases. And so what we're asking the Court to do is not to exonerate Mr. Miller or to give him a good conduct medal. We're asking the Court to hold the mail and wire fraud statute within their proper bounds as set. So suppose somebody, imagine somebody goes on eBay and he offers for sale a baseball glove and he accurately describes its size and shape and manufacturer, has a picture. And then he goes on to say this glove was previously owned by Willie Mays, but that part's a lie. Is that wire fraud? Well, there are two levels of answer to that. First of all, it would be up to a jury to decide whether the lie about Willie Mays' prior ownership was an essential aspect of the transaction. I think that would go directly to the value of the glove. Just a regular old glove might be worth 10 bucks. A glove owned by Willie Mays would be worth thousands of dollars. That's a huge difference. That's not this case. And so setting aside for a moment your instructional challenges.  Why couldn't a properly instructed jury on the evidence before it conclude that this case is exactly that? Because drugs that had a proper chain of custody from the manufacturer to the ultimate purchaser are worth more than drugs that were stored in somebody's office in a pizza restaurant. Because it's the quality of the drugs that matters. It is the quality of the drugs. And the evidence here showed that these were real drugs in the original packaging, sealed, high quality. There was also evidence. I mean, the jury might have believed that. But there was also evidence that when you don't have the proper chain of custody, you don't know whether they're safe. And the storage conditions might not have been what the storage conditions were supposed to be. And some of the, in at least some cases, the drugs weren't actually what it said on the label. And so from all of that, you could infer that drugs with the kind of chain of custody that was actually present here are worth less than ones with the known verified appropriate chain of custody. Well, there was a lot of speculation about what might or might not have been wrong with these drugs. But there wasn't any evidence that that actually was the case. The government, after years of investigation, found a handful of bottles that had problems. What the government never showed and never attempted to show and could not have shown is that Mr. Miller's company's bad bottle rate, if I can call it that, was worse than the bad bottle rate for the authorized distributors, the regular course of conduct. We presented evidence at trial that McKesson, one of the authorized distributors, had bad bottles, got a warning letter from the FDA for selling bad bottles to Rite Aid and Albertsons. Now, that's not to throw stones at McKesson. It is to say that in any operation like this, there will be a small number of errors. Mr. Miller's company's error rate was no higher, not shown to be any higher. But is that—I mean, if you tell somebody, you know, I'm selling you one thing, and you actually give them a different thing, do you think it's a defense to fraud to say, well, the thing I gave you, which wasn't what I told you I would be giving you, you know, had the same value as the thing you thought you were getting? Well— I mean, because that seems like a requirement of a financial loss, which Shaw says is not a requirement, right? It's not a requirement that there actually be a loss. It's a requirement that economic loss be contemplated as part of the scheme. And that's, by the way, the issue that CUSCIS will decide in the next few months. It was not the object of this scheme. There is no evidence at all of that. So it's not a question of loss, although there was no loss here, as a matter of fact. The victims in the case bought these drugs from Mr. Miller, sold them to consumers at a profit, and even after Mr. Miller got charged and they were aware of the allegations in this case, they never went back to the consumers and said, oh, by the way, we owe you a refund. So economic harm was never the object of this. And so in answer to your question, no, it is not a mail or wire fraud offense to sell something through deception unless the object of the scheme is to cause economic harm. That's the point of Takaloff. It's the point of Millhiser, and Your Honor, I know, was on that panel. You don't have a mail. You may have other crimes. And in fact, here you do on count 14. But you don't have mail and wire fraud unless harm to an economic interest is an object of the scheme. Do you think it would be this? Stating the proposition, as you just stated, it seems very close to the question presented in Coussis. Do you think it would be appropriate for us to hold this case for that? I do. I didn't. A month and a half ago, when the government conceded that the materiality instruction was correct, I took a different view. I wanted the case to get resolved quickly. I think at this point, Coussis, it's argued December the 9th. There'll be a decision probably in the spring. No matter what the court does, Mr. Miller, who is incarcerated now, he's going to have to serve time on count 14. So there's no, that I can see no harm to him from having the court wait for Coussis. And Coussis, it can go one of two ways the way I see it. Well, there's a third way. But let me talk about how I think Coussis might come out. Coussis may hold, and certainly the petitioner has made, in my view, a strong argument for this, that contemplated economic harm is a requirement for mail and wire fraud. If that's the holding in Coussis, Mr. Miller wins. And he doesn't just win on the instructional challenge. He wins on the judgment of acquittal, in my view. The other way Coussis could come out is the way the Solicitor General is arguing, which is contemplated harm to an economic interest is not a requirement to have a scheme to defraud under the mail and wire fraud statutes. But to prevent those statutes from expanding to cover every manner of contractual dishonesty, you have to have this heightened materiality standard, the very essence of the bargain. I asked for that instruction in Mr. Miller's case. I took it straight out of the Solicitor General's brief in Seminole. The Solicitor General in Coussis has made exactly the same argument. And that's why the government has confessed error in this case on that instruction, because the government didn't want to be inconsistent with the position it was taking in Coussis and the Supreme Court. So let's say the Supreme Court sides with the Solicitor General. It presumably will agree that that heightened materiality standard applies. And if it does, Mr. Miller doesn't get a judgment of acquittal, because I think a reasonable jury could come out either way on that. But he would have a Sixth Amendment right to a jury finding under a proper instruction on that element. So the government has suggested that the failure to give that instruction was harmless. What's your response to that? I supported Mr. Miller's arguments, but it didn't change them. The arguments are the same. The government elected not to raise harmless error. In Millhiser, this court declined to, first of all, recognize that the government hadn't raised harmless error and declined to do so sua sponte. I don't think the court should do it sua sponte here. In Millhiser, the court said that only happens in extraordinary cases and typically where the element at issue is undisputed. Suppose we thought that Millhiser was a sufficiently significant change that their failure to raise it before Millhiser could be excused. What's your response on the merits of the argument? My response on the merits is that materiality was hotly contested in this case. I argued it in closing. The evidence from Stephanie Kornichuk, who was one of the main victim witnesses in this case, I thought bore very heavily on whether the deception here, the falsehood, was material. Ms. Kornichuk was the representative of a company called Genoa Health, which had a lot of pharmacies. Mr. Miller's products were sold in four states and 12 pharmacies. She figured out, she was pretty sophisticated, she went online where the manufacturers of drugs maintain lists of authorized distributors and she looked for B&Y, the Puerto Rican company. It wasn't there. She contacted the FDA, talked to an FDA agent. This is in 2010, before she's ever doing business with Mr. Miller. The FDA agent had been investigating Mr. Miller's company for years at that point, knew all about it, and without quite warning her off suggested that Mr. Miller was a bad actor and not somebody that she should be doing business with. She did business with Mr. Miller anyway. She did business with him for two years. She did $20 to $25 million worth of business. And by the way, when she testified at trial, she didn't report any problems whatsoever with Mr. Miller's product. So, to me, that goes pretty strongly to materiality. Now, the government certainly would have its arguments at a trial on materiality, but to say that that is harmless beyond a reasonable doubt, I don't think the court can get there. And by the way, one other thing. After I argued materiality, citing Ms. Kornichuk's testimony in closing, the government got up in rebuttal. It put up a slide showing the weaker materiality instruction, the one that was inadequate in Millheiser, and it argued to the jury, and I'm paraphrasing here, but it's quoted in our brief, this really isn't that high of a standard. This is not a high bar that we have to cross, this materiality. You can find it pretty easily. The fact that the government was able to get up and make that argument in rebuttal in response to my argument focusing on Ms. Kornichuk and focusing on other aspects of the record as well was very damaging. And to say that that whole series of events, the improper instruction, the government's reliance on that instruction in rebuttal, the government's argument to the jury, you don't really have to find anything much here to find materiality, that that's harmless beyond a reasonable doubt, I don't think the court can do that, even if the government had raised it, which it did not. Can you address, one of the instructions that you wanted was about, would have told the jury that accurate information on the source of the drugs does not constitute property, and assuming that to be a correct statement of the law, why do you think it was necessary for the district court to give that? Was there any suggestion that accurate information might have constituted property? That was not the government's property argument at trial. That I readily acknowledge. The problem is the accurate information theory and the fraud and the inducement theory morph into each other very easily, because on one hand, you don't have any economic loss. You don't have any intent to cause economic loss. And a jury, a court for that matter, like in Bruckhausen, can very easily look at that and say, well, there's no economic harm here, so what's the property interest? There's no intent to cause economic harm. And the easy next step, you see it in Simonelli, you see it in Bruckhausen, you see it in Sadler, the Sixth Circuit case, is you sort of elide those two things. You move readily from harm to a property interest like money to a property interest like information, accurate information, the right to control. And I was worried at trial that the jury was going to go there, because there was no evidence that these people suffered any harm or that Mr. Miller intended to cause them any economic harm. They all made a profit. And so the easy next step for a jury is to think, well, sure, they made a profit, but they didn't have this information that they needed, and that's the property. That's what I was worried about. And if you look at the way the cases play out, where one theory morphs into another so readily, I think it was a valid concern. You're down to about three and a half minutes. Yes, I'll save the rest of my time. And we'll hear from the government. Ms. Chan. Good morning, Your Honors. May it please the Court, my name is Mary Jean Chan, and I represent the United States in this appeal. Miller's scheme here was to pass off diverted drugs harvested from the streets that were storaged in haphazard conditions as prescription drugs that had remained in the regulated state-licensed chain, supply chain. This is not what his customers, hundreds of pharmacies across 38 states, wanted. They testified to this over and over again at trial. This is not what they thought they were buying. This is not what he offered them to purchase. And this is paradigmatic fraud. This is not a situation such as Cusicius. It's not a situation such as Simonelli. It is not a situation where the government's theory was ever honor services fraud or just a deprivation of accurate information. This Court should resist the defendant's attempt to shoehorn the facts of this case into those very different scenarios. And it should find that the jury instructions here allowed the jury to properly convict the defendant on counts 1 to 13. In any case, the evidence was overwhelmingly in support of their convictions. To begin with, the object of the scheme for wire fraud and mail fraud has to be money or property. It is true that right now the Cusici Court will be looking at whether net pecuniary loss is a requirement, but that is not the current case of the law. The current situation and the current state of the law requires only that there be an object of money or property. And that is manifestly met here where Miller's scheme was to get these people to buy these pharmacies to purchase from him these drugs that were diverted drugs that he misrepresented. In terms of materiality, I should just clarify that the government didn't concede that it was erroneous for the Court not to give Miller's proposed instruction of materiality. We were clarifying that the language that we used on pages 38 to 39 of our answering brief was overbroad in saying that there was no legal basis because that was no longer true when Millhiser subsequently came down and said specifically that the nature of the bargain language was something that was important in looking at the correct scope of a scheme to defraud. And that language in Millhiser was something that this Court adopted for the first time from several other circuits. The Second Circuit, the Eleventh Circuit, the Sixth Circuit, but it had not previously been part of this Court's case law. So, Millhiser… I noticed that your 28-J letter is cited in the government's brief in Koussissis, which is not sure I recall a case where the government's Supreme Court brief cited a Court of Appeals 28-J letter. But, so, I mean, I take it we are to infer from that that it's not just the developments in this circuit, but that is reflective of the position of the United States as to what the materiality element is now. Is that right? The Solicitor General has taken a consistent position with respect to materiality in the Simonelli brief as well as the Koussissis brief. And there was concern, because it had been raised in the briefing in Koussissis, that the government's position, in this case Miller, might be read to be inconsistent with that position. And that is something that we wanted to clarify was not the case. The government speaks with one voice here. However, materiality with respect to the instruction was not required here because, as Millhiser explained, that type of instruction can cure an overbroad government theory. That was what was presented in Millhiser, where there was an overbroad theory of fraud. There was not such an overbroad theory of fraud here. This is quintessential fraud, where you had Miller representing, like a snake oil salesman, that what he was selling the pharmacies was one thing when it was really something else. And characterizing the essential quality of that drugs, having traveled in the regulated supply chain as information, and the fact that that was information should be, therefore, putting it into the other category of the right to accurate information, would basically completely cannibalize the fraud statute and put everything in that category. Because any characteristic about a product could be characterized in some fashion as information about that, and therefore characterized as about the right to accurate information. But that's not the situation here. What we have here is the core of fraud, where what Miller represented that he was selling was not actually what he was selling. So is it your position that the essence of the bargain materiality instruction was a correct statement of the law, but it was nonetheless unnecessary to give it here because the evidence just didn't support it? Is that what you're saying? That's basically it, Your Honor. In Millhiser, this court said that there was an overbroad theory of fraud and then looked to see whether the jury instructions could save that. And if there had been such a nature of the bargain or essence of the bargain during instruction, then it would have saved that overbroad theory because it would not have allowed the jury to convict on misrepresentations that didn't go to the actual price or the quality of the toner. But why isn't it—I mean, I take it his position is, well, my misrepresentations really didn't go to the quality of the goods because, like, my goods were—these drugs were just as good and all this. So why isn't that a factual question that needed to be presented to the jury so that they could decide, you know, whether you're right or whether he's right about that? Well, I think the instructions that were here allow the jury to do that because there was a requirement to find that the defendant intended to deceive and cheat his customers. And here, based upon his theory, if what he had said, if the customers actually knew that the pedigree was false, if they didn't really care about it, then there was no real deceit. And there was also no cheating because they knew what they were getting was what he was actually giving them as opposed to what he said. But the terms of what he sold, the terms of what MIC and Miller sold were drugs that had legitimate pedigrees. In fact, part of the deal was that when you got an invoice for the drugs that you purchased, you could go online and then find the pedigree. And that is what pharmacist after pharmacist testified that they did. When they received their shipments, they would go online and check the pedigree to make sure that it lined up because they were required to. So the value of the drugs was immensely lower to the extent that it had any value for these pharmacists. And that's not even including the extra trouble it took some of them. As the court is likely aware, there were a number of instances starting in 2009 where, at least in the record that shows, where pharmacists reported or customers reported that the drugs that they received were not things that were supposed to be in there. One child got three times the strength of Bilify that he was prescribed, a mood-stabilizing drug. There were customers or patients who received HIV medication when they were supposed to be being treated for Hepatitis B. Over and over, you have these situations. And what these pharmacists did when they received this was they tried to track down the source of the problem. And that goes to the heart of why this was such a problem in terms of what Miller was doing and why there was really no evidence to support that what the customers got was what they expected to get and that there was that price, the price or the price discount was the only thing and the only thing that was central to the bargain or transaction here. These were not even the terms of what Miller offered. Miller understood, and the evidence showed this overwhelmingly, that these pedigrees were important. In fact, when Ara Karapetyan first reached out to him and they were about to do business as a supplier with the medication, I'm sorry, I have the wrong person in mind. I mean David Kongsberg. When he first reached out to Miller or Miller and he were put in touch, Miller's first question to him was, do you have pedigree for these drugs? Because Miller understood that pedigree was extremely important to the transaction of pharmaceuticals. It is a specific regulated industry and it held a special meaning. But now, I mean, Mr. Klein told us, I'm forgetting the name of the witness, but there was a witness who said, you know, we kept on buying, you know, and so one can infer that at least some of the buyers maybe didn't care. What's your answer to that? My answer to that is, first of all, that Judy Rumpler is the pharmaceutical representative for QL Med, and that is the one, the pharmacy that was charged in counts 5 to 12, all but two of the male fraud counts. And she very specifically testified that as to her and her company, her pharmacy, they cared. That they cared that the pedigrees were available, and she would not have done business with any supplier that could not provide pedigrees. And that is at Volume 8 of Excerpts of Record, pages 1,666 to 69. So that's as to her. So when we're talking about customers, that is one particular customer. So whatever Stephanie Kornacek did or did not do, in some ways, does not undermine what decision Ms. Rumpler made. However, Stephanie Kornacek's testimony is not exactly as my friend on the other side has represented it. She represented that she was very caring about pedigrees, and that is why she kept trying to chase down to see whether these pedigrees were legitimate. And ultimately, when she was not able to get a good answer, because instead of satisfying her questions, David Miller flew up to Seattle and took her and her husband to a Mariners game with very good seats. She decided, this is not good, I feel very uncomfortable about this, and I am going to stop doing business with MIC. In fact, at Excerpts of Record, Volume 3, page 576, there is an interaction where MIC wanted to expand business with her and said, let me give you some discounts, hopefully that will change your calculus. And her response very succinctly said, pedigree is the key. And shortly thereafter, she stopped doing business with MIC and David Miller because pedigree was important to her. Justin Chan from Premium Pharmacy in Queens, New York, where there was a problem also, said that the reason they did business with secondary distributors was mostly because of the availability of product, not just pricing. Pedigree is critical, he said. Excerpt of Record, Volume 6, 1151. Paul O'Leary, the CEO of Parkview Health Services, said the same thing. He would not buy drugs from any wholesaler that did not provide legitimate pedigree. Excerpts of Record, Volume 3, 507-08. So you had pharmacists after pharmacists say that this was extremely important to them, and of course this was something that was required by law. And you had experts, Michael Ignacio from the California Board of Pharmacy, as well as Karen Rothschild from the FDA, testify as to the requirements of the Prescription Drug Marketing Act. You had the manufacturer, Gilead, testify to this. Amerisource Bergen, a primary wholesaler, testified to this. Alexander Solomon, one of the suppliers of the illicit drugs, explained that the pedigree is important because you needed a pedigree in order to, quote, make a sale. Miller knew that pedigrees are important. Email after email that was introduced through Special Agent Tovey explained that he internally with MIC and other people that he was dealing with talked about pedigrees and the importance of pedigrees and how to satisfy customers over their need for pedigrees. So if we conclude that he was entitled to, in essence, the bargain materiality instruction, all of this evidence that you've just described, I guess, goes to whether the absence of the instruction was harmless. What do we do with the fact that you didn't argue harmlessness until your 28-J letter? Well, I think, first of all, you can find that we did implicitly make the argument in our answering brief because we talked a lot about the evidence. Secondly, we did make it explicitly, and so this court should find that any delay was inadvertent. And it was partly because Millhiser really crystallized the issue. As I mentioned before, even though the argument was made by the defendant, Millhiser is the first time that this court specifically imported or adopted the nature of the bargain language. And that, I think, was the first time that the government should have picked up on this. We should have discussed it in our answering brief, but it was not, and it was not really brought into this case until the reply brief in which basically every single page of the defendant's brief cited it. And so when it was put in sharp relief, the government answered that and explained why we think that harmless beyond reasonable doubt here, even if that instruction should have been given, which we don't think so, should not compromise the integrity of these jury verdicts. The other thing I would say is that even if this court finds that it needs to look at the heightened standard that it applied in the Millhiser and Yates cases with respect to sort of sua sponte, we believe that we meet that standard. The length and the complexity of the record, it's not that complex. It's really a very straightforward, simple case. As the district court repeatedly said, it's a straightforward theory. There are many pages of it, of course, but it's not a particularly onerous record. The harmlessness is certain, and it shouldn't be debatable. As I said, every single person who testified really was categorical in saying that the pedigrees were central to the value proposition that David Miller made to his customers. Retrying with the additional Millhiser-based jury instructions would not result in a different verdict. While it would require a costly new trial, and also it wouldn't really make too much of a difference in the sentence because, as Miller just noted, he is not contesting count 14, which by itself brings with it a 60-month sentence. I should also say with respect to the harmless beyond reasonable doubt standard, that Mr. Miller was able to make the arguments that he wants to make with the existing jury instructions. He repeatedly said that he didn't cheat the clients because they wanted a cheap drug, and that is what he gave them, and that they really didn't care too much about the pedigrees because they must have been focused on the price. And again, the fact that the jury instructions require that Miller be found to have deceived and cheated that he had a scheme to defraud really encompasses that theory. And that is why, for example, in this Court's unpublished decision in Hansen, this Court found that where you didn't have an overbought theory, such as in Millhiser, you don't have to look at the jury instructional question because you don't need the instructions to cure. Even right now with the Ninth Circuit model jury instructions, which now import the language from Millhiser, it is not something that is a definition of one of the elements. It is extra commentary, which helps to delineate the proper scope of a scheme to defraud. What we have here is the heartland of what the fraud statutes were intended to criminalize and penalize. Before you sit down, can you address the suggestion that the case be held for the Supreme Court's decision in Gassisi's? I don't think it's necessary, Your Honor, because, again, Gassisi is different in terms of the fact pattern. In that case, we don't have the quintessential situation where you have somebody selling something that is not what is purported to be. It is more of the contracting type of a scenario where the qualifications of the person who is bidding or trying to seek work are not what they represent it to be. So there is a question about whether net pecuniary loss is a requirement in that context, but I think that is only in that context as opposed to what we have here, which is just traditional property fraud. We don't have to wait for that. But if this court feels more comfortable waiting, of course, the government would have no objection to that. With that, we ask for an affirmance. Thank you. Thank you. In Millhiser, the court found an overbroad fraud theory, and it found an overbroad fraud theory because the government's theory was that if you lied to get someone to enter into a contract to buy a product from you, even if you gave them full value, that was mail and wire fraud. That was exactly the government's theory here. We quote repeatedly in our brief from the government making exactly that argument in its closing argument and again in its rebuttal that the overbroad theory in Millhiser is the same overbroad theory here. The Millhiser District Court gave what I'll call the weak materiality instruction. So did the district court here. This court held in Millhiser that that heightened materiality standard was necessary to cabin the overbroad fraud theory. Exactly the same is true here. The heightened materiality standard is necessary to cabin the overbroad fraud theory. The government says CUSCIS is different than this. CUSCIS is a fraud in the inducement case. It has the same pattern that you have here. Someone uses deception to enter into a contract. They provide full value, and then the question is, is that enough for mail and wire fraud? CUSCIS says no. CUSCIS, the petitioner, says no, that the object of the scheme has to be to cause economic harm. That's exactly what we're arguing here. The solicitor general says you don't have to intend to cause economic harm or have that as the object, but you do have to have this heightened materiality standard. Well, we've got both ends covered here because we asked for that heightened materiality standard, which Millhiser adopted. If the court adopts either of those views, Mr. Miller should prevail here. The court should not find the error harmless here. It was not harmless. It was certainly not harmless beyond a reasonable doubt. Materiality was hotly contested. Yes, pharmacists came in and said if we'd known this, we wouldn't have bought it. Of course they're going to say that at this point. The same thing happened in Millhiser. Witnesses came in and said, oh, if I'd known the true facts instead of the false facts, I wouldn't have bought the product. That wasn't enough to lead this court to find harmless error, and it shouldn't be here either. Mr. Miller has a Sixth Amendment right to a jury determination on the critical issues in his case based on proper jury instructions. He did not get proper jury instructions. And certainly he should get an opportunity to present his arguments to a jury and get a determination by a jury. Thank you. Thank you. I thank both counsel for their helpful arguments in this case, and the case is submitted.
judges: THOMAS, MILLER, Molloy